IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| LORI LOVEDAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 6:20-cv-03050-MDH |
| | ) | |
| WCA MANAGEMENT COMPANY, LP, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 55). The parties have fully briefed the pending motion and it is now ripe for review. For the reasons stated herein, the Court denies Defendant's motion for summary judgment on Counts III and VI, Plaintiff's ADA and MHRA claims. The Court dismisses Counts I, II, IV, and V based on Plaintiff's response stating she "does not dispute dismissal of Counts I, II, IV, or V."

## BACKGROUND

Defendant WCA Management Company is a waste management company that operates in the state of Missouri. On or around March 27, 2017, WCA hired Loveday as a sales representative at its Springfield, Missouri location. Randy Thompson is the district manager over the Missouri region where Loveday was employed. In September 2017, Christopher Fahnestock joined WCA as regional sales manager. Fahnestock was responsible for overseeing the sales representatives in the State of Missouri and had the authority to hire and fire employees. The parties dispute whether Thompson's approval was required for terminations. In March 2018, Paul Spitz became regional sales supervisor over the Missouri South region, which included the Springfield location. As regional sales supervisor, Spitz was responsible for supervising the sales team in Missouri South

1

and building the sales team in that region. While Spitz did not have authority to hire or fire employees, he could make recommendations regarding employees he supervised.

In March 2018, Spitz was Loveday's direct supervisor and Fahnestock was her indirect supervisor. During the relevant period, Kelly Paterson worked as WCA's human resources business partner. In her role as human resources business partner, Paterson partnered with the regional offices and the frontline supervisors, managers, and the regional vice president to handle HR related issues, including employee relations issues, compensation matters, benefits issues, and compliance issues, including compliance with the ADA.

Loveday's position as a sales representative included soliciting new commercial business on behalf of WCA in Springfield, Mo.[1] While Plaintiff states she was always on an incentivized compensation model, in January 2018, Loveday was placed on a "goal based" compensation model, which outlined an incentivized commission plan which was tied to sales performance. As part of the plan, Loveday was responsible for identifying viable leads, managing prospects, and acquiring new, profitable commercial, industrial, and recycling business to meet and exceed monthly established targeted revenue goals. Under the compensation plan, Loveday had a net new business sales goal of $1,200 per month and was required to have 200 monthly activities. Monthly activities were tracked and included face-to-face visits, phone calls, and details about a sales representative's "sales pipeline" and potential sales opportunities. The parties dispute some of the specific details of the compensation plan.

In June 2018, Loveday received an updated compensation plan and a salary increase to $36,000. Loveday contends the increase was related to performance. WCA states the increase

---

[1] Loveday has submitted an affidavit denying this fact and attaching an affidavit that says the first 6-9 months of her position she was directed to work on renewing contracts with existing customers. However, the record includes evidence to support her job also included soliciting new business.

2

was due to a salary alignment implemented by Fahnestock to create a common pay structure to all Missouri sales representatives under his supervision. The parties do not dispute that even though the June 2018 compensation plan reflects a net new business goal of $2,000, Loveday's goal remained at $1,200. Between January and June 2018, Loveday only obtained her $1,200 net new business goal in the month of March. She did exceed the goal in March by 362% but did not meet her goal during the other months.

Thompson testified that while he had not observed Loveday perform her duties as a sales representative, by the end of 2017 or beginning of 2018, he had formed an opinion that Loveday was not doing a good job because she was not growing new business on a consistent basis. His opinion was based on his review of Springfield's profit and loss statements and the fact that he did not see revenue growth at the Springfield location. In addition, Spitz testified that Loveday did not believe in meeting customers face-to-face or going door-to-door (i.e. "cold-calling").

In June 2018, Loveday sent an email to Fahnestock in which she acknowledged that her sales numbers were "horrible," and she sought assistance from Fahnestock to meet her sales goals. In addition, Loveday told Fahnestock that she "loved her job." Around this time, Fahnestock and Spitz began a coaching plan with Loveday which included Spitz going on a "ride-along" with her to provide coaching feedback and training on different sales techniques. WCA contends during the "ride-along," Spitz and Loveday were able to secure seven new leads for Loveday within the first mile of the street, and Spitz then assigned the street exclusively to Loveday and directed her to work the remaining nine miles of the street until all businesses were visited in person, which Spitz estimated would take at least one month. Loveday disputes this occurred as set forth by WCA.

3

Case 6:20-cv-03050-MDH   Document 59   Filed 07/29/21   Page 3 of 17

Loveday's June total for net new business was only $268, plus $32.21 in service increase dollars, well below her $1,200 net new business goal. On or around June 25, 2018, Spitz notified Fahnestock that he planned to issue a Performance Improvement Plan ("PIP") to Loveday in July because of her failure to meet her sales goals, and as a means to continuing to develop Loveday as a sales representative. Spitz prepared the PIP with input from Fahnestock.

On July 2, 2018, Spitz met with Loveday to discuss her poor performance and to notify her that she was being placed on a PIP. The PIP identified three separate performance issues: (1) failure to meet sales goals/monthly quota of $1,200 for net new business; (2) failure to make the 50-80 weekly meaningful contacts with new customers; (3) falsifying the weekly sales reporting sent to Spitz and Bridgette Hurla. Loveday denies she falsified weekly sales. The PIP was set to be reviewed at the end of 30-days. Pursuant to the PIP, if Loveday did not meet the PIP's expectations, she could be subject to discharge. Loveday disputes she was informed she could be discharged for failure to meet her PIP goals. After Loveday was placed on the PIP, she complained to Spitz that she was being "singled out."

On July 9, 2018, Loveday arrived at the Springfield Office and co-workers observed that she was experiencing chest pains, arm numbness, and was "white as a ghost." Loveday testified that she began experiencing chest pains as she was driving back to the Springfield office and that the chest pains continued when she arrived at the office. Loveday's co-workers told her that she "looked terrible" and suggested that she go to the emergency room. One co-worker recalls being concerned that Loveday was having a heart attack and encouraged Loveday to go to the hospital by ambulance. Loveday's co-workers contacted Paterson to report that Loveday was complaining of physical issues (i.e. chest pains and arm numbness) and they were concerned about Loveday because she did not look well and she was not making any sense. Loveday indicated she would

refuse an ambulance so she was driven to the hospital by a co-worker and was admitted overnight for observation.

While Loveday was in the hospital, she received a call from Paterson and Fahnestock. Loveday contends they told her she would have to go on a mandatory leave of absence. WCA states Loveday was told she would be placed on a paid leave of absence pending a medical release to work. During this call the parties dispute who first referenced the issue but Loveday's medication for anxiety and depression was discussed and it was discussed that Loveday was getting help from a psychiatrist or psychologist.

On July 10, 2018, one day after Loveday went to the hospital, Paterson sent an email indicating Loveday was going to be placed on leave. That same day, Spitz sent an email to Paterson regarding Lovejoy. The parties dispute the contents of the email in the briefing. However, the email states the following:

> 6-26-18
> During our weekly ride along on our lunch break Lori told me in person she had won a trip and fall lawsuit a few years back for $8,000. She is also currently involved in another trip and fall lawsuit, that has been in the court system for over a year or so. She also indicated she has a class action lawsuit against her old employer, SSS Properties as well. In this case she indicated she testified in early June 2018 at trial. I was a little taken aback hearing this, but chalked it up to happenstance. She has in the past said she has had several concussions, surgeries, and multiple other health issues requiring her to have medication.

> 7-2-18
> Over the last several months Lori has continually failed to meet her sales quota. So we decided to put her on a PIP. After the meeting, "which" did not go very well, she called Sara Burchfield repeatedly reaching out for some guidance, comfort I guess. They talk daily, and are friends. During the conversation Lori continued to say she felt singled out, and it was unfair to be put on this 30-day PIP. She verbally over the phone told Sara, she would kill herself if she were to be fired. Stating she was too old to be hired, no good jobs available in SSW MO for her, etc.etc. She was very upset, and Sara was pretty shaken up over the call. I asked Sara to discontinue talking to her on a personal level at this point. But Sara can't help it, and kept an open line to her. Sara was very upset that Lori would put her into this stressful situation, and 100% believes from the conversation it is a serious matter.

5

7-5-18

Lori again called Sara, but this time after a long rant Sara cut her off, and told her verbally not to call her anymore, because she couldn't take the stress of the calls. Later that night Lori sent me a long winded, very weird text. Asking if she was going to get fired, and asking me to reply yes or no, and to just say anything to help her. Because she was stressed and couldn't sleep lately, I replied that these things are better discussed in person, and I would see her at 8:30 am for a meeting. She seemed upset I think because of many factors including Sara's conversation that day.

7-6-18

I had Denise Buckner as a witness during our meeting. Every Friday at 8:30am we are to meet and go over her weekly numbers as part of this PIP process. We tried to talk business as much as possible, but Lori again stated she felt singled out, and nobody was helping her. She was not very coherent, and I repeatedly went over the same items several times. Later after the meeting she called me, again saying her mind isn't always right, and again stated her many medical issues related to trip and falls, abuse by her ex-husband, medications, current ongoing injuries, current stress from the lawsuits she is going through, etc. etc. etc. She repeatedly said she was sorry for mis reporting sales numbers the last few weeks, saying it was a mistake. She then just began to ramble on, and I forgot any other details from the call.

7-10-18

I was not here, but she came into the office and employees noticed right away she was white as a ghost, and they asked if she was ok. She stated she felt chest pains, and her arm was numb. Justin drove her to the hospital, and returned to work. I have had no contact with her so far, she has not replied to any text.

The culmination of many factors, and conversations are leading me to believe she is not well mentally, or physically. This has been going on for several months, but since the PIP process started, it's just gotten to an out of control situation. I do actually have a very clear concern for this employee going forward.

Denise Buckner and I have had many conversations about Lori, and if you reach out to her she might have more details I'm missing.

Spitz testified that he sent the email at Paterson's request and to make sure he provided Paterson with an overall summary of his knowledge concerning Loveday in light of Loveday's medical emergency in the Springfield office. Further, Burchfield testified that she was concerned for Loveday and that she reported Loveday's statement, regarding that she was going to lose her

6

job, and that if she lost her job she would kill herself. Loveday contends that Spitz's July 10, 2018 email demonstrates that WCA perceived her as "mentally unstable." However, Loveday admits that during her employment no one at WCA ever mentioned or said to her that they believed she was "mentally unstable."

Paterson forwarded the email to Carrie Miller stating that they were placing Loveday on a paid leave of absence pending medical release to return to work. The email stated she was following up to whether or not she was admitted to the hospital.

On or around July 10, 2018, Paterson asked Loveday whether her hospital discharge paperwork indicated that she could return to work and told Loveday that she would need to provide a medical release from a medical professional stating that she could return to work. Paterson testified that she understood that Loveday was upset that she could not come back to work without the medical release. Paterson placed Loveday on paid administrative leave while she obtained the medical release. Loveday received her base salary while on paid leave.

Paterson states that she made the decision to require Loveday to provide a medical release from a medical professional because: (1) she was aware that Loveday had experienced a medical emergency at the job, that she had been admitted to the hospital as a result, (2) that Loveday told her that she needed rest and that she was taking medication for a mental condition, (3) she was concerned about whether Loveday was ready to return to work, and (4) she had no knowledge of whether Loveday had a mental or physical condition and she had no documentation clearing her to return to work given the recent circumstances.

Loveday states she was also later informed she would need to obtain a mental health release in addition to a physical release. Paterson's testimony states she was concerned about whether Loveday was physically or mentally ready to return to work in light of the July 9th event, the

7

hospitalization, and that Loveday was taking medication. Paterson contends she informed Loveday she would need a release from any medical professional that she could return to work. WCA's corporate representative testified that it would be inappropriate for Human Resources to demand a mental health release for an employee to return to work under the company's alleged unwritten practice. The parties dispute whether Loveday was told she needed a release from a mental health provider.

On July 16, 2018, Paterson sent a letter to Loveday informing her that she received a report that she was exhibiting signs at work that she needed medical assistance, that a WCA employee drove her to the hospital, and that she was admitted overnight for testing. Paterson stated that for this reason WCA was requiring a physician's release to be sure that it is safe for her to physically work. Paterson also stated that it had been reported that if she lost her job she would kill herself and that she was exhibiting signs of extreme stress at work and in her personal life. Paterson stated, for this reason, WCA was requiring a mental health release to be sure that it is safe for Loveday to mentally work.

Loveday asserts that she is not disabled and has never been diagnosed with a disability. However, Loveday claims WCA regarded her as disabled and that she was forced to take leave even though she did not want to. WCA states that if an employee has an incident on the job where first responders may need to be called or the employee is transported to the hospital or any emergency care facility as a result of a medical emergency, then it is the Company's practice to ask for a doctor's release to ensure the employee can safely return to work. Loveday claims this "practice" was handled on a case by cases basis and WCA had no way of knowing whether an employee had actually been seen at a hospital.

WCA's written policy required employees who were out of work for more than three days to provide a doctor's note certifying their return. The written policy did not require a note for being out less than three days. WCA contends it had an unwritten practice that required employees who left work during a medical emergency to bring a return-to-work note and further that the written policy required employees returning from a leave of absence due to illness or injury to provide a release from a medical professional. While Loveday was on paid leave, her PIP was put on hold pending her return to work.

On July 23, 2018, Loveday's personal physician, Dr. Richard Cunningham issued a doctor's note which released Loveday to work on August 6, 2018. On July 26, 2018, Loveday notified Paterson that her physician, planned to release her to work on August 6, 2018. On July 30, 2018, Fahnestock sent an email to Paterson and Spitz stating:

> Are there any steps in place we should be prepared to take in regards to Lori Loveday to cover us from future issues? She will be returning to her PIP, what if she again threatens her life and publically broadcasts it? Is there anything we can do excusing us from liability at that point? Can we release her from employment legally before the completion of her PIP based on her instability or extend her leave into a suspension but be able to replace her pending a full investigation?

Paterson responded as follows:

> When she returns, I would give her a day to get back into the hang of things before returning to the PIP. Just so you know, she stated that she didn't threaten life. She stated that if she lost her job with WCA that she would just "die." She also stated that she in on medication but not for depression/anxiety or any other mental issue. She state that she is now seeing a counselor and really likes it and it has helped her to manage her stress.

> We cannot release her or terminate her due to "instability>" This would be classified as a disability and would be in violation of the ADA… With this being said, we can lawfully terminate her for cause or for any legal reason.

> As for the PIP, let's continue it. Did Paul give her a time frame for the PIP for Improvement? If she does not comply with the PIP or make efforts to comply with the PIP, then we don't have to wait until the deadline of the PIP. Let's keep a close

9

eye on her when she comes back. I did talk with her about not sharing person and/or medical information with her co-workers.

Loveday returned to work on August 6, 2018. When Loveday returned to work, Spitz met with her to reinstate the PIP. Loveday re-signed the PIP on August 6, 2018 and testified that she understood that she needed to meet the goals set out in the PIP by September 6, 2018. In her deposition, Loveday claimed that she was at a disadvantage because she had been on leave and claims that she told Spitz that she needed additional time to complete the PIP. Both Spitz and Fahnestock deny that Loveday made a request for additional time on the PIP.

On September 6, 2018, the day the PIP expired, Fahnestock notified Paterson that Loveday failed to meet the PIP requirements and that he would recommend moving forward with termination. Paterson requested documentation. Fahnestock sent her the information that she had failed to meet the net new business component of her PIP as she had only accomplished $660 in commercial new business. He stated that she appeared to hit the activity requirements but the performance goal was not achieved.

On September 7, 2018, Loveday sent her weekly email which listed her new commercial business numbers total at only $660.95, which was below her $1,200 net new business goal.

On September 13, 2018, Fahnestock was working with Paterson to create a termination letter. In addition, Spitz was working to gather any outstanding executed service agreement contracts from Loveday so that he could calculate her final commission check which WCA planned to deliver to Loveday at the termination meeting. In an email exchange on September 13, 2018, Spitz wrote an email stating, in part,

> Lori's PIP process. Plan to terminate once we have a replacement identified. … Chris wants to wait until we find another replacement for Lori – to terminate, he is worried about the lost revenue to finish 2018. She averages $500 per month, so I am not too worried about the $2,000 hit from this date till Dec. 31st. I can find a replacement ASAP, and have interviewed a few candidates already …

10

In response, Randy Thompson, district manager, stated "If we wait too long on Lori and she hits her goal in September we'll be screwed."

On September 18, 2018, Fahnestock notified Loveday of her discharge over the phone with Paterson as a witness. Loveday testified that Fahnestock told her that she had not met WCA's standards and that her employment was being terminated effective immediately. In addition, Loveday was provided a termination letter which explained that her revenue performance had fallen below expectations over the past several months, that she was placed on a PIP, and that at the end of the 30-day PIP period she failed to meet the sale revenue goal.[2]

In her deposition, Loveday claims that sales representative Tim Thompson ("T. Thompson") missed his net new business goals and was never been disciplined. Thompson, a former sales representative for WCA's Branson, Missouri territory, testified that his sales goals were not measured monthly because Branson is a tourist town that shuts down from Christmas Day until Easter, and therefore his goals were measured on an annual basis. Thompson further testified that he had weekly, monthly, and yearly "cold calling" goals, and to his recollection, he never failed to hit those goals. In addition, Spitz testified that, other than Loveday, he did not have any other sales representatives who had been employed for 15 months and who missed their sales goals for consecutive months.

An account manager, Gerri Woodward, was also supervised by Fahnestock. Plaintiff contends Woodward did not meet her outside sales goals in between January and December 2018. Woodward failed to achieve 80% of her new business sales goals in 8 of the 12 months and her

---

[2] Additional facts regarding Loveday's allegations of misconduct have been dismissed by Loveday as stated in her opposition briefing.

11

Case 6:20-cv-03050-MDH   Document 59   Filed 07/29/21   Page 11 of 17

overall goals 11 of the 12 months of 2018. Loveday states Woodward was not disciplined for failing to meet her goals.

Another sales representative in Springfield, Missouri, Burchfield, had outside sales goals lower than Loveday. Loveday contends she failed to meet her outside sales goals between August and December 2018 and was not disciplined. WCA argues Burchfield was on a six month training or transition period to get her up to speed on sales. Finally, Loveday argues Muntzel also failed to achieve her production goals and was not disciplined. WCA disputes these facts arguing that these employees are not similarly situated to Loveday's position and sales requirements.

## STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual

12

dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011). In addition, "while employment discrimination cases are often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment." *Shirrell v. Saint Francis Med. Ctr.*, 24 F. Supp. 3d 851, 855–56 (E.D.Mo.2014); citing Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir.2010); citing *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999). In fact, there is no separate summary judgment standard for employment discrimination cases, and "it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Id.*

## DISCUSSION

To begin, Plaintiff does not dispute the dismissal of Counts I, II, IV, or V. As a result, those claims shall be dismissed. However, Plaintiff does oppose summary judgment on Counts III and VI, her claims alleging discrimination based on a perceived disability under the MHRA and the ADA.

The ADA and MHRA prohibit employers from discriminating against "qualified individuals" based on disability. 42 U.S.C. § 12112(a) and Mo. Rev. Stat. § 213.055.1(1)(a). A qualified individual is a person who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds. *Sandbach v. Rafco Clean, LLC*, 2020 WL 109591, *2 (E.D.Mo. Jan. 9, 2020). As amended, the ADA defines disability as: a) a physical or mental impairment that substantially limits on or more major life activities of such individual; b) a record of such an impairment; or c) being regarded as having such an impairment. 42 U.S.C. §12102(a). An individual is "regarded as having such an

13

impairment" if that individual has been subjected to an action prohibited under the chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. *Id*. at 12102(3)(A). The analysis is the same under the MHRA. See *Heuton v. Ford Motor Co*., 930 F.3d 1015, 1019 (8th Cir. 2019), reh'g denied (Aug. 30, 2019).

Prohibited discrimination includes intentional discrimination, as shown by evidence of disparate treatment or other proof that will vary according to the specific facts of the case. *Sandbach*, 2020 WL 109591 at *2. In the absence of direct evidence of an employer's discriminatory intent, a plaintiff may offer indirect evidence of disability discrimination. *Id.* Courts apply the *McDonnell Douglas* framework when a plaintiff relies on indirect evidence to prove intentional discrimination.

Under this standard the plaintiff must prove a prima facie case by showing: 1) that he or she was disabled within the meaning of the ADA; 2) that the plaintiff was qualified to perform the job with or without an accommodation; and 3) a causal connection between the employer's adverse action and the disability. *Id.* If the plaintiff establishes a prima facie case, the burden shift to the employer to show a legitimate, non-discriminatory reason for the adverse action. *Id.* The burden then shifts back to plaintiff to show the proffered reason was pretextual. *Id.*

To prevail, Loveday must establish that she was terminated by WCA because it perceived her as disabled. Loveday must show that either WCA wrongly believed she had an impairment that substantially limited one or more major life activities or wrongly believed that an actual, non-limiting impairment substantially limited one or more major life activities.

On July 9, 2018, Loveday suffered a medical emergency at work and was taken to the hospital by her co-workers. WCA argues because of this event they required Loveday to provide

14

Case 6:20-cv-03050-MDH   Document 59   Filed 07/29/21   Page 14 of 17

a medical release clearing her to return to work. Loveday argues WCA perceived her as disabled based on the following: 1) her supervisor's July 10, 2018 email indicating that she was not well mentally or physically and that his concerns about her health had been ongoing for several months; 2) that she was the only employee placed on a PIP and that there is evidence her supervisor was concerned with her health and "stability" prior to the July 9th medical event and prior to when she was placed on the PIP; and 3) she was placed on a leave of absence without a recommendation from a doctor and not pursuant to any WCA written policy or practice.

Loveday argues her supervisor's email specifically notes his concern that there have been issues "ongoing for several months" and that her supervisor believed she was not well mentally or physically. Loveday's supervisor's comments that his concerns about Loveday's "health" had been ongoing for months, even prior to the July 9th hospital event, and prior to the PIP being implemented, raises a question of fact regarding the motive behind the actions taken. Further, Loveday has provided evidence she was quickly placed on leave without a recommendation from her doctor, and arguably against her wishes, within 24 hours of having a medical incident. Further, the day after this incident, when Loveday was contacted by WCA, it was not yet known to what extent Loveday would need time off work, if any, but was informed she would be placed on leave before any such information was received. The timing of the incident, her supervisors' comments, and the requirement for leave and medical notes raises an issue of fact to survive summary judgment.

Further, Loveday argues she was terminated for this perceived disability based on the following: 1) Fahnestock's email asking whether they could terminate Loveday before the completion of the PIP "due to her instability"; 2) other employees were not disciplined for failing to meet sales quotas; and 3) she was terminated shortly after returning from leave. Loveday argues

15

there is a causal connection between her termination and her perceived disability. WCA argues she was placed on her PIP upon return to work and was unable to meet her goals and therefore was terminated for failure to perform.

Here, Loveday has presented enough evidence, and has created a question of fact, regarding other employees who allegedly failed to meet their sales quotas and were not placed on PIPs. This coupled with WCA's concerns about her "instability," which are evidenced to have arisen prior to placing her on a PIP, create a question of fact to preclude summary judgment. Further, a reasonable juror could find that Loveday's treatment both before, during, and after the leave process was inconsistent with the policies of WCA regarding when an employee is required to provide a medical note and when an employee must be placed on leave.

WCA's human resources informed Loveday's supervisors that they could not release her or terminate her due to "instability." WCA's human resources acknowledged any such termination would be classified as a violation of the ADA. Here, the Court finds Loveday has submitted enough evidence to create a genuine issue of material fact to survive summary judgment. There is evidence that both Loveday's supervisors and Human Resources expressed concerns and beliefs that Loveday was suffering mentally and physically, that she was unstable, and that she would be required to provide a medical release to work (beyond the written policies regarding medical releases). This evidence is sufficient to survive summary judgment as it could establish that WCA believed Loveday was suffering from a mental illness which would fall under a disability within the ADA and MHRA.

Further, with regard to the termination the District Manager's email stating "we will be screwed" if Loveday makes her September goals could lead a reasonable juror to conclude that Loveday was not terminated for failure to perform or meet her goals as it appears at least one of

her managers wanted to terminate her regardless of the sales numbers. In addition, it appears from the email Loveday's supervisor had already "interviewed a few candidates" to replace Loveday possibly before the PIP process ended.

Wherefore, after reviewing the record in a light most favorable to Loveday, the Court finds the emails regarding Loveday's mental and physical instability, coupled with the proximity of her termination to her return to work and the district managers' comments on her termination, create a genuine issue of material fact as to whether she was terminated due to a perceived disability. As a result, the Court denies Defendant's motion for summary judgment. While the Court finds Loveday has presented enough evidence to create an issue of fact to survive summary judgment, the Court's ruling is not intended to suggest that Loveday will ultimately prevail on her claims.

## CONCLUSION

After a review of the record before the Court, and after considering the facts in a light most favorable to the Plaintiff, the Court hereby **DENIES** Defendant's motion for summary judgment on Counts III and VI. The Court further **ORDERS** Counts I, II, IV, and V are dismissed with prejudice.

**IT IS SO ORDERED.**

Date: July 29, 2021

                                                   _/s/ Douglas Harpool_
                                                   **DOUGLAS HARPOOL**
                                                   **UNITED STATES DISTRICT JUDGE**